**ORAL ARGUMENT SCHEDULED FOR OCTOBER 11, 2016**

No. 14-5105

Consolidated with Nos. 14-5106, 14-5107, 14-7124, 14-7125, 14-7127, 14-7128, 14-7207; 16-7044; 16-7045; 16-7046; 16-7048; 16-7049; 16-7050; 16-7052

―――――――――――――――――――――――――――――――――――

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――――――――――――――――――――

JAMES OWENS, ET AL., *Plaintiffs-Appellees*,

v.

REPUBLIC OF SUDAN, MINISTRY OF EXTERNAL AFFAIRS AND MINISTRY OF THE INTERIOR OF THE REPUBLIC OF SUDAN, *Defendants-Appellants*.

―――――――――――――――――――――――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――――――――――――

**FINAL BRIEF OF PLAINTIFFS-APPELLEES**

―――――――――――――――――――――――――――――――――――

Steven R. Perles
Edward B. MacAllister
PERLES LAW FIRM, PC
1050 Connecticut Avenue, N.W.
Suite 500
Washington, D.C.  20036
(202) 955-9055
sperles@perleslaw.com
emacallister@perleslaw.com

Stuart H. Newberger
Clifton S. Elgarten
Aryeh S. Portnoy
Emily Alban
John L. Murino
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2500
snewberger@crowell.com

*(Additional Counsel Listed On Inside Cover)*

Thomas Fortune Fay
FAY LAW GROUP, P.A.
777 6th Street, N.W., Suite 410
Washington, D.C.  20001
(202) 589-1300
ThomasFay@aol.com

John Vail, Esquire
JOHN VAIL LAW PLLC
777 6th Street, N.W., Suite 410
Washington, D.C.  20007
(202) 589-1300
john@johnvaillaw.com

Jane Carol Norman
BOND & NORMAN LAW, P.C.
777 6th Street, NW
Suite 410
Washington, D.C.  20001
(202) 682-4100
janenorman@bondandnorman.com

Matthew D. McGill
Jonathan C. Bond
Michael R. Huston
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
MMcGill@gibsondunn.com

Michael J. Miller
David J. Dickens
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA  22960
(540) 672-4224
mmiller@millerfirmllc.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties And *Amici*

All parties, intervenors and amici appearing before the district court and in this Court are listed in the Certificate as to Parties, Rulings, and Related Cases, filed by Defendants-Appellants on May 27, 2016.

### B.    Rulings Under Review

Reference to the rulings at issue appears in the Certificate as to Parties, Rulings, and Related Cases, filed by Defendants-Appellants on May 27, 2016.

### C.    Related Cases

A list of related cases appears in the Certificate as to Parties, Rulings, and Related Cases, filed by Defendants-Appellants on May 27, 2016.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ................................................................................v

STATUTES AND REGULATIONS ......................................................1

STATEMENT OF ISSUES ...............................................................1

INTRODUCTION ...............................................................................2

COUNTER-STATEMENT OF THE CASE ...............................................4

    A.    Sudan Actively Supports Al-Qaeda's Terrorist Operations.................4

    B.    Sudan Deliberately Abandons The Litigation......................................7

    C.    Absent Sudan Receives Extensive Legal Process And The
        District Court Finds Liability And Damages. .....................................10

    D.    The District Court Denies Sudan's Belated Attempts To
        Evade The Judgments.........................................................................12

SUMMARY OF ARGUMENT ..............................................................15

STANDARD OF REVIEW ...................................................................17

ARGUMENT ....................................................................................18

I.    TERRORIST BOMBINGS INTENDED TO KILL, AND WHICH
    DO IN FACT KILL, ARE EXTRAJUDICIAL KILLINGS.........................19

    A.    The Unambiguous Language Of Section 1605A Includes
        Terrorist Bombings That Produce Mass Killings. ..............................19

    B.    The FSIA's Legislative History Cannot Trump The Clear
        Statutory Text; Indeed, It Further Undermines Sudan's
        Position...............................................................................................22

ii

      1.     Congress Intended The Terrorism Exception To Cover Terrorist Bombings. ........................................22

      2.     Sudan Misreads The Legislative History And International-Law Principles That Congress Supposedly Incorporated. ......................................24

II.   SUDAN'S BELATED CHALLENGES TO CAUSATION DO NOT OVERCOME THE DISTRICT COURT'S DETAILED FACTUAL FINDINGS. ......................................27

    A.   The District Court Made The Requisite Causation Findings For All Plaintiffs.................................27

    B.   Appellate Review Of The District Court's Causation Findings Is Narrowly Circumscribed. ...............28

      1.     For Section 1605A(c) Claims, There Was No Need For A Separate Jurisdictional Review And The District Court's Findings Are Reviewable Only Under Section 1608(e). ......................................29

      2.     The District Court's Causation Findings For State-Law Claims Are Reviewable At Most Only For Clear Error. ......................................34

    C.   The Record Amply Supports The District Court's Findings That Sudan's Material Support Proximately Caused The Bombings.................................36

III.  SUDAN'S CHALLENGES TO FAMILY-MEMBER PLAINTIFFS' CLAIMS LACK MERIT. ......................................45

    A.   Section 1605A Creates Jurisdiction For Family-Member Claims.................................45

    B.   Family-Member Plaintiffs Have Claims Under State Law.................47

    C.   Family-Member Plaintiffs Established Valid Intentional Infliction of Emotional Distress Claims Under D.C. Law.................49

IV.   SUDAN'S CONTENTION THAT THE *OPATI*, ALIGANGA,
      AND *KHALIQ* PLAINTIFFS' CLAIMS ARE UNTIMELY IS
      FORFEITED AND MERITLESS. ..................................................51

      A.    Sudan Forfeited Its Nonjurisdictional Time-Bar Defense. .................51

      B.    The Claims Fall Squarely Within The Limitations Period. ................54

V.    THE COURT DID NOT ERR IN AWARDING PUNITIVE
      DAMAGES....................................................................................57

      A.    Congress Authorized Punitive Damages For Prior Acts....................57

      B.    Punitive Damages Are Available Under State Law............................60

VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
      BY DECLINING TO VACATE THE JUDGMENTS BASED ON
      SUDAN'S INEXCUSABLE NEGLECT....................................................61

CONCLUSION ........................................................................................64

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*\*Agudas Chasidei Chabad of U.S. v. Russian Federation*,
  528 F.3d 934 (D.C. Cir. 2008)................................................................29, 30

*Amador Cty v. U.S. Dep't of Interior*,
  772 F.3d 901 (D.C. Cir. 2014).......................................................................34

*Antoine v. Atlas Turner, Inc.*,
  66 F.3d 105 (6th Cir. 1995) ....................................................................32, 44

*Bakhtiar v. Islamic Republic of Iran*,
  668 F.3d 773 (D.C. Cir. 2012).......................................................................59

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
  734 F.3d 1175 (D.C. Cir. 2013)................................................................18, 36

*Boim v. Holy Land Foundation for Relief and Development*,
  549 F.3d 685 (7th Cir. 2008) ........................................................................42

*Bridgeway Corp. v. Citibank*,
  201 F.3d 134 (2d Cir. 2000) .........................................................................44

*Bridoux v. Eastern Air Lines*,
  214 F.2d 207 (D.C. Cir. 1954)........................................................................62

*Central Vermont Public Service Corp. v. Herbert*,
  341 F.3d 186 (2d Cir. 2003) ..........................................................................36

*\*Cicippio-Puleo v. Islamic Republic of Iran*,
  353 F.3d 1024 (D.C. Cir. 2004)................................................................45, 46

*\*Commercial Bank of Kuwait v. Rafidain Bank*,
  15 F.3d 238 (2d Cir. 1994) ...............................................................18, 32, 33

*Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana
  de Aviacion*,
  88 F.3d 948 (11th Cir. 1996) .........................................................................32

\*Authorities on which this brief chiefly relies are marked with an asterisk.

v

*Dammarell v. Islamic Republic of Iran*,
    281 F.Supp. 2d 105 (D.D.C. 2003) .................................................................23

*Estate of Doe v. Islamic Republic of Iran*,
    808 F. Supp. 2d 1 (D.D.C. 2011) .................................................................55

*\*Estate of Heiser v. Islamic Republic of Iran*,
    659 F. Supp. 2d 20 (D.D.C. 2009) ...........................................................49, 50

*\*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
    447 F.3d 835 (D.C. Cir. 2006) ...........................................................18, 62, 63

*Flanagan v. Islamic Republic of Iran*,
    No. 10-1643 (RC), 2016 WL 3149560 (D.D.C. June 3, 2016) ...................18, 30

*Flatow v. Islamic Republic of Iran*,
    999 F.Supp. 1 (D.D.C. 1998) .................................................................23

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ...........................................................................22, 24

*Goetz v. Synthesys Techs., Inc.*,
    415 F.3d 481 (5th Cir. 2005) .................................................................36

*Goldring ex rel. Anderson v. District of Columbia*,
    416 F.3d 70 (D.C. Cir. 2005) .................................................................20

*\*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014) ...........................................................33, 39, 44

*Hedgepeth v. Whitman Walker Clinic*,
    22 A.3d 789 (D.C. 2011) .......................................................................50

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
    784 F.3d 804 (D.C. Cir. 2012) .................................................................29

*Henderson v. Shinseki*,
    131 S. Ct. 1197 (2011) .........................................................................52

*Hill v. Republic of Iraq*,
    328 F.3d 680 (D.C. Cir. 2003) .................................................................33

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)..................................................................................43

*Howard University v. Wilkins*,
    22 A.3d 774 (D.C. 2011) ....................................................................60

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009).....................................................55

*In re Terrorist Bombings of U.S. Embassies in E. Africa*,
    552 F.3d 93 (2d Cir. 2008) .................................................................44

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993)............................................................41

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004)..............................17, 31, 34, 35, 39

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)......................................................................57, 58

*Lawson v. Suwannee Fruit & S.S. Co.*,
    336 U.S. 198 (1949).............................................................................22

*Leibovitch v. Islamic Republic of Iran*,
    697 F.3d 561 (7th Cir. 2012) ..............................................................46

*Manhattan Properties v. Irving Trust Co.*,
    291 U.S. 320 (1934).............................................................................23

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ...............................................................41

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010).............................................................................23

*Merrill Lynch Mortg. Corp. v. Narayan*,
    908 F.2d 246 (7th Cir. 1990) ..............................................................61

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011).............................................................................22

*Mohamad v. Palestinian Authority*,
  132 S. Ct. 1702 (2012)......................................................................22

*Musacchio v. United States*,
  136 S. Ct. 709 (2016)......................................................................52

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009)...................................................................22, 56

*Nyambal v. Int'l Monetary Fund*,
  772 F.3d 277 (D.C. Cir. 2014).......................................................36

*Oveissi v. Islamic Republic of Iran*,
  573 F.3d 835 (D.C. Cir. 2009).......................................................46

*\*Owens v. Republic of Sudan*,
  531 F.3d 884 (D.C. Cir. 2008).........................................................9

*Pitt v. District of Columbia*,
  491 F.3d 494 (D.C. Cir. 2007).......................................................49

*\*Practical Concepts, Inc. v. Republic of Bolivia*,
  811 F.2d 1543 (D.C. Cir. 1987)..........................................18, 32, 48

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004).......................................................36

*\*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004).......................................................................58

*Republic of Iraq v. Beaty*,
  556 U.S. 848 (2009).......................................................................53

*Rimkus v. Islamic Republic of Iran*,
  750 F. Supp. 2d 163 (D.D.C. 2010)................................................60

*\*Roeder v. Islamic Republic of Iran*,
  646 F.3d 56 (D.C. Cir. 2011).........................................................55

*Rothstein v. UBS*,
  708 F.3d 82 (2d Cir. 2013) ............................................................39

*Russello v. United States*,
    464 U.S. 16 (1983)..................................................................................46

*Salazar ex rel. Salazar v. D.C.*,
    633 F.3d 1110 (D.C. Cir. 2011)..................................................61, 63

*Salazar v. Islamic Republic of Iran*,
    370 F. Supp. 2d 105 (D.D.C. 2005)....................................................50

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    133 S. Ct. 817 (2013)..........................................................................52

*Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)............................................................................55

*Simon v. Republic of Hungary*,
    812 F.3d 127 (D.C. Cir. 2016)...........................................29, 30, 31

*Simon v. Republic of Iraq*,
    529 F.3d 1187 (D.C. Cir. 2008)....................................31, 34, 35, 53

*Spannaus v. U.S. Dep't of Justice*,
    824 F.2d 52 (D.C. Cir. 1987)..............................................................53

*Ungar v. Palestine Liberation Org.*,
    599 F.3d 79 (1st Cir. 2010)................................................................63

*United States ex rel. Lujan v. Hughes Aircraft Co.*,
    243 F.3d 1181 (9th Cir. 2001) ...........................................................55

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    608 F.3d 871 (D.C. Cir. 2010)...........................................................43

*United States v. Benkahla*,
    530 F.3d 300 (4th Cir. 2008) .............................................................11

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011) .......................................................11, 41

*United States v. Foster*,
    986 F.2d 541 (D.C. Cir. 1993)...........................................................39

*United States v. Hall*,
   969 F.2d 1102 (D.C. Cir. 1992) ..........................................................40

*\*United States v. Kwai Fun Wong*,
   135 S. Ct. 1625 (2015) ...........................................................51, 52, 53

*United States v. Washington*,
   106 F.3d 983 (D.C. Cir. 1997) ..........................................................44

*Wagner v. Islamic Republic of Iran*,
   172 F.Supp. 2d 128 (D.D.C. 2001) ....................................................23

*Waller v. Burlington N. R.R. Co.*,
   650 F. Supp. 988 (N.D. Ill. 1987) ......................................................55

**Statutes**

28 U.S.C. §1350 ..................................................................15, 20, 21, 25

28 U.S.C. §1603 ..................................................................................2

28 U.S.C. §1605(A)(1) ......................................................................19

28 U.S.C. §1605(a)(7) ............................... 8, 9, 19, 23, 24, 26, 31, 45,
   ......................................................... 47, 53, 54, 55, 56, 59

28 U.S.C. §1605(f) .............................................................................53

28 U.S.C. §1605(g) ............................................................................53

28 U.S.C. §1605A ......................... 1, 2, 9, 14, 15, 16, 17, 19, 21, 24, 39,
   ......................................... 45, 46, 47, 48, 53, 54, 55, 56, 59, 60

28 U.S.C. §1605A(a) ........................... 9, 16, 30, 31, 34, 45, 46, 48, 52

28 U.S.C. §1605A(a)(1)
   ......................................... 1, 15, 17, 19, 29, 30, 34

28 U.S.C. §1605A(a)(2)
   ..............................................................1, 19, 30, 46

28 U.S.C. §1605A(b) ................................................16, 51, 52, 53, 54

28 U.S.C. §1605A(c) ............................... 9, 12, 13, 28, 29, 30, 31, 56, 59

28 U.S.C. §1605A(c)(4) ................................................................48

28 U.S.C. §1605A(h)(7) ...............................................................20

28 U.S.C. §1606 ..................................................17, 47, 48, 60

28 U.S.C. §1608(e) ...................... 10, 15, 17, 28, 29, 31, 32, 33, 44

28 U.S.C. §2401(a) ......................................................................53

42 U.S.C. §10609 .........................................................................24

Pub. L. No. 106-386, §2002(a)(2)(A), 114 Stat. 1464 (2000) ...................................23

Pub. L. No. 110–181, §1083(c)(3), 122 Stat. 3 (2008) ..........................54, 55, 56, 59

**Rules**

Fed. R. Civ. P. 8(c)(1) ..................................................................51

Fed. R. Civ. P. 12(b) ....................................................................31

Fed. R. Civ. P. 60(b)(1) ...............................................................2

Fed. R. Civ. P. 60(b)(6) ...............................................................2

Fed. R. Evid. 702 .........................................................................40

Fed. R. Evid. 703 .........................................................................41

Fed. R. Evid. 803(8)(A) ...............................................................44

Fed. R. Evid. 805(a)(5)(A) ...........................................................44

Fed. R. Evid. 807 .........................................................................44

**U.S. Constitution**

U.S. Const. art. I, §9, cl.3, amend. V ...........................................57

U.S. Const. Due-Process Clause ...................................................57

U.S. Const. Takings Clause ..........................................................57

**Other Authorities**

153 Cong. Rec. 22,665 (2007) ................................................................23

154 Cong. Rec. S54-01 (2008) ...............................................23, 56, 59

176 A.L.R. Fed. 1 §5.................................................................................24

176 A.L.R. Fed. 1 §18..............................................................................50

182 A.L.R. Fed. 1 §§8(c)-(d) ................................................................50

Black's Law Dictionary 302 (10th ed. 2014) ......................................46

Dobbs, *The Law of Torts*, §307 (2000) ................................................49

Geneva Convention Relative to the Treatment of Prisoners of War
    (Aug. 12, 1949) ...........................................................................25, 26

H.R. Rep. 106-939 (2000)........................................................................23

H.R. Rep. 110-477 (2007).........................................................................59

H.R. Rep. No. 103-702 (1994)................................................................47

Restatement (Second) of Torts § 46, Caveat (Am. Law Inst. 1965) ......................49

Restatement (Third) of Torts § 46 cmt. *m* (2012)..........................50, 51

## STATUTES AND REGULATIONS

All applicable statutes are contained in the Addendum filed with Defendants-Appellants Brief.

## STATEMENT OF ISSUES

1.    Did the District Court have jurisdiction to render a default judgment against Sudan under 28 U.S.C. §1605A where the Plaintiffs were found to have asserted non-frivolous claims under §1605A(a)(1) and, following Sudan's default, provided satisfactory evidence supporting those claims?

2.    Is a terrorist bombing an extrajudicial killing?

3.    Does the word "claimant" in §1605A(a)(2) mean someone who asserts a claim or is it limited to a "legal representative"?

4.    Did §1605A eliminate the longstanding ability of claimants to bring state law claims under the terrorism exception to sovereign immunity?

5.    Are terrorist attacks the type of actions for which D.C. law permits recovery for intentional infliction of emotional distress even without physical presence?

6.    Were any claims at issue on this appeal barred by the statute of limitations, and, in any event, did Sudan waive the affirmative defense of statute of limitations by defaulting?

1

7.    Where Congress specified the application of 28 U.S.C. §1605A to pending suits, and expressly authorized the imposition of punitive damages, were punitive damages available here?

8.    Did the district court abuse its discretion in rejecting Sudan's motion to vacate under F.R.C.P. 60(b)(1) and (6) after Sudan intentionally defaulted?

## INTRODUCTION

At half-past ten in the morning of August 7, 1998, al-Qaeda suicide bombers drove trucks filled with explosives into the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania.  The massive, near-simultaneous explosions killed more than 200 people, including 12 Americans, and injured thousands.  As the district court that heard extensive evidence in these consolidated cases found, al-Qaeda was able carry out those attacks only because, throughout the 1990s, the Sudanese government deliberately provided material support to the terror group's planning, recruitment, and training activities.

Sudan chose not to dispute the district court's finding at the time.  Despite initially appearing, Sudan abandoned the litigation for years.  As required by the Foreign Sovereign Immunities Act, 28 U.S.C. §1603 *et seq.*, however, the district court did not simply enter default judgments on that basis.  Instead, it held a lengthy evidentiary hearing, carefully considered extensive live testimony and

other evidence (including multiple expert reports), found that Plaintiffs proved each element of their claims, and entered judgments on the merits.

Sudan then sought a do-over. In 2014 it reappeared to appeal the judgments, and then filed Rule 60(b) motions belatedly attempting to backfill defenses it elected not to assert years earlier. The district court rejected every one.

Sudan now reprises those arguments on appeal in scattershot fashion. None provides any basis for upsetting the judgments. Indeed, the centerpiece of Sudan's submission is an attempt to litigate the very factual issue it deliberately chose not to dispute years ago: whether Sudan's intentional, material support of al-Qaeda proximately caused Plaintiffs' injuries. The district court *twice* explicitly found—once after Sudan abandoned the case, and again after it reappeared—that the evidence amply proved causation as to all Plaintiffs. The extensive record overwhelmingly supports that conclusion, and Sudan does not come close to establishing (as it must) that the district court clearly erred.

This is not the typical FSIA suit, nor even a typical default case where a foreign state simply fails to appear. Sudan participated initially before consciously choosing to walk away, and the district court thoroughly evaluated the law and facts. And then, when Sudan sought Rule 60 relief, the district court patiently reexamined the evidence, considering and rejecting each of Sudan's arguments for escaping responsibility for the tragedy its active sponsorship of al-Qaeda caused.

Sudan identifies no error in those rulings, let alone any ground to upset the district court's judgments. This Court should affirm the judgments in all respects.

## COUNTER-STATEMENT OF THE CASE

### A.    Sudan Actively Supports Al-Qaeda's Terrorist Operations.

**1.**    Around 1990, pressure in Afghanistan and Pakistan forced al-Qaeda's founder, Osama bin Laden, to seek a new base of operations. JA258, 260-63, 366-67, 392. General Omar al-Bashir, who overthrew the Sudanese government in a military coup the year before, provided the solution. JA392, 862. After installing himself as President, al-Bashir implemented Sharia law and began courting terror organizations. JA369-70, 392. Sudan "invited any group that espoused revolutionary Islamic ideology," including "the Palestinian HAMAS movement," "Hezbollah," "al-Qaeda," and many others, "to take a base in Khartoum." JA266. And "most of them did." JA266. President al-Bashir personally sent a letter to Osama bin Laden in 1991, inviting him and al-Qaeda to come to Sudan and establish a base to prepare for Jihad. JA277, 366-70, 392-3. For al-Bashir's fledgling regime, bringing al-Qaeda to Sudan meant military support, money, and advancement of al-Bashir's radical ideology. Al-Qaeda agreed to support Sudan's war against Christians and animists in south Sudan. JA367, 392-33. Bin Laden also funneled money into Sudan to prop up al-Bashir's government, investing $50 million in Sudan's Al Shamal Islamic Bank. JA837.

4

In exchange, Sudan guaranteed al-Qaeda a base from which to operate with impunity. Bin Laden tasked Jamal al-Fadl, a high-ranking al-Qaeda member who later defected to the United States, with overseeing the move to Sudan and forging the relationship between al-Qaeda and the government of Sudan. JA277-79, 393-94. Al-Fadl "served as an intermediary between al-Qaeda and the Sudanese intelligence service." JA2717.

2.      For the next five years, al-Qaeda "'grew into a sophisticated organization'" and thrived in Sudan. JA400 (quoting JA841). Al-Qaeda established numerous businesses to finance and provide cover for its terror activities. JA286-89, 398-99. These businesses allowed al-Qaeda to exchange currency, buy goods, and launder money without raising international suspicion. JA398-99.

Al-Qaeda operated in Sudan with "full support by the Sudanese government," which provided "[c]omplacent banks, customs exemptions, [and] tax privileges.'" JA400 (quoting JA841). Sudan also provided al-Qaeda's operatives with Sudanese citizenship and passports that ensuring unencumbered travel without "'normal immigration and customs controls,'" including to their terror cell in Nairobi, Kenya, which planned and organized the 1998 embassy bombings. JA276-77, 400-03. Sudanese military and intelligence forces also staved off "any 'problems with the local police or authorities,'" enabling al-Qaeda to conduct

5

explosives training and other operations free from interference.  JA304, 398.  The Sudanese military further aided al-Qaeda in transporting weapons and in attempting to acquire nuclear weapons and develop chemical weapons.  JA318-319, 401.  Members of the Sudanese military even acted as bin Laden's personal guards.  JA401.  "'The Sudanese intelligence service viewed al-Qaeda as a proxy, much the way that Iran views Hezbollah as a proxy.'"  JA302-03.

**3.**     The Sudanese government knew al-Qaeda was using its base in Sudan—and the regime's support and protection—to plan and prepare for terror attacks, including on the United States.  While based in Sudan, al-Qaeda planned and conducted terror attacks throughout Africa, including attacking U.S. forces in the 1993 Battle of Mogadishu, Somalia.  JA297-98.

In 1993, the State Department placed Sudan on the list of state sponsors of terrorism because it was "harbor[ing] international terrorist groups."  JA396, 863; *see* JA291-93.  In 1996, under international pressure, Sudan expelled bin Laden, but refused to turn him over to the United States or grant international bodies access to al-Qaeda's training camps.  JA401-02, 865-66.  When bin Laden left, al-Qaeda operatives remained behind, with Sudan's continued support.  JA238-40, 339, 397, 732-34.  The State Department's Reports on "Patterns of Global Terrorism" for 1998, 1999, and 2000 describe how Sudan continued to serve as a

"safe haven" and "training hub" for al-Qaeda and other Islamic terror groups. JA343-44.

**4.** Sudan's active assistance to al-Qaeda was "indispensable" to the 1998 U.S. embassies bombings. JA860-61. "'The Sudanese government never offered intelligence regarding al Qaeda cells that might have helped the U.S. unravel the plots" to attack the embassies. JA401-02 (quoting JA865-66). On the contrary, Sudanese intelligence provided al-Qaeda with weapons and explosives and smuggled operatives and funds from Sudan to al-Qaeda's Nairobi cell, which ultimately carried out its plan to devastate the U.S. embassies. JA304, 402-03. The plot murdered and injured scores of U.S. and foreign citizens, U.S. nationals, and U.S. embassy workers. JA347-350, 402-03.

## B. Sudan Deliberately Abandons The Litigation.

**1.** This appeal consists of seven consolidated cases involving eight plaintiff groups.[1] James Owens, a U.S. citizen injured in the Tanzania attack, filed first in October 2001. Owens was later joined by others injured or killed in the bombings and their family members. Initially, Plaintiffs sued the Republic of

---

[1] The seven district-court cases were brought by the *Owens* (No.01-2244), *Wamai* (No.08-1349), *Amduso* (No.08-1361), *Mwila* (No.08-1377), *Onsongo* (No.08-1380), *Khaliq* (No.08-1356), and *Opati* (No.12-1224) Plaintiffs. The eighth group, the Aliganga Plaintiffs—Americans killed in the attack—intervened in the *Owens* case in 2012. *Owens*, D.E.233.

Sudan and its Ministry of the Interior under state law for providing material support to the al-Qaeda terrorists who committed the attacks. JA2667. Plaintiffs invoked the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), which removed foreign-state immunity for providing material support for an "extrajudicial killing" that caused personal injury or death. 28 U.S.C. §1605(a)(7)(2001).

Although Sudan was duly served in *Owens*, it did not appear. In May 2003 the district court entered a default.

**2.** In 2004, Sudan appeared and moved to vacate the default and dismiss the case, arguing it was immune under the FSIA. JA658-59. Plaintiffs repleaded, and Sudan again moved to dismiss. Sudan contended that Plaintiffs had not sufficiently alleged that Sudan provided material support to al-Qaeda or that Sudan's support caused Plaintiffs' harm; it did not dispute that the bombings were acts of "extrajudicial killing," nor did it challenge the factual basis of Plaintiffs' allegations of causation. In 2006, the district court denied Sudan's motion, holding that Plaintiffs had pleaded material support in various forms by Sudanese government officials, and those allegations permitted the conclusion that Sudan's support caused the bombings. JA658-63. This Court affirmed, holding the pleadings demonstrated "a causal connection between Sudan's actions and the

embassy bombings." *Owens v. Republic of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008).

Sudan stopped communicating with its counsel in 2007, and, in January 2009, the district court granted Sudan's counsel's motion to withdraw. *Id.*; *Owens*, D.E.148. Sudan did not resume participation in the litigation until April 2014. JA2669-72.

**3.**     While Sudan's appeal was pending in this Court in 2008, Congress amended the FSIA by repealing §1605(a)(7) and replacing it with a revised terrorism exception, 28 U.S.C. §1605A. Section 1605A included an identical exception to sovereign immunity, but added a private right of action against a state sponsor of terrorism for an injured U.S. national, service member, or employee (or their legal representative), and authorized punitive damages. *Id.* §1605A(c).

Four new plaintiff groups then filed similar suits (*Wamai*, *Amduso*, *Mwila*, and *Onsongo*) against Sudan arising from the bombings, asserting both state law and the new federal right of action. In January 2009, Owens and other plaintiffs amended their complaints to add, where available, federal claims under §1605A(c). All Plaintiffs based jurisdiction on §1605A(a), because their suit sought "money damages" against Sudan "for personal injury or death that was caused by" the bombings, "an act of … extrajudicial killing" for which Sudan provided "material support or resources."

9

### C.   Absent Sudan Receives Extensive Legal Process And The District Court Finds Liability And Damages.

**1.**   The FSIA prohibits entry of a default judgment against a sovereign "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. §1608(e).  The district court accordingly held a three-day evidentiary hearing in October 2010 to establish Sudan's liability.  *See* JA660-61.

The district court heard a wide range of evidence, including live testimony from lay and expert witnesses, videotaped testimony, transcripts of testimony from other cases, affidavits, and U.S. government reports, all concerning the embassy attacks and Sudan's relationship with al-Qaeda.  For example, the district court considered the testimony of Jamal al-Fadl, the Sudanese former al-Qaeda operative, who testified at length in the 2001 federal criminal trial of bin Laden for the 1998 Embassy bombings, about al-Qaeda's interaction with Sudanese governmental officials during the 1990s.  JA201-02.  Plaintiffs also proffered declassified CIA and State Department records describing Sudan's support for al-Qaeda's terrorist activity both before and after the 1998 Embassy bombings.  JA730-31, 732-34, 788-92, 803-815.

The district court admitted three experts to provide testimony and statements on the history of al-Qaeda and Sudan.  JA207-08, 258, 266.  The experts included Dr. Lorenzo Vidino from Harvard's Kennedy School of Government, the author of several books and articles on Islamic terrorism.  JA827-29.  Steven N. Simon

testified based on his extensive experience in Middle-Eastern terrorism acquired through decades of working in the State Department and coordinating foreign counterterrorism policy and operations for President Clinton's National Security Council from 1994-1999. JA862-63. Also testifying was Evan Kohlmann, credited as an expert "about al Qaeda's history and structure" on many occasions in contested U.S. federal proceedings.[2] These experts all testified extensively regarding the many ways that Sudan knowingly provided material support for al-Qaeda and its terrorist operations throughout the 1990s.

**2.** In 2011, the district court produced an exhaustive opinion with its findings of fact and conclusions of law.[3] JA378. The court concluded that Sudan had provided al-Qaeda safe harbor, as well as financial, military, and intelligence assistance, that "enabled al Qaeda to build its terrorist cells in Kenya, Somalia, and Tanzania." JA403; *see also* JA350-353. The court found that "Sudanese government support was critical to the success of the 1998 embassy bombings." JA403-04. Moreover, Sudan "'kn[ew] that al Qaeda intended to attack the citizens, or interests of the United States.'" JA403 (quoting JA866). Thus, Plaintiffs

---

[2] *See*, *e.g*., *United States v. Farhane*, 634 F.3d 127, 158-159 (2d Cir. 2011); *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008).

[3] Sudan was served with this opinion, *Owens*, D.E.254, just as it had been served with the summons and complaints from all the consolidated cases.

11

established that Sudan provided material support for the acts of extrajudicial killing.  JA407-13.

The district court awarded relief to all Plaintiffs.  United States nationals and government employees could recover under the federal cause of action in §1605A(c).  JA2719-23.  Foreign family members could recover under state tort law.  JA2723-29.

The district court referred Plaintiffs' claims to special masters for individualized assessment of damages.  After receiving the special masters' reports, the district court issued final judgments in all cases in March 2014 and July 2014, awarding compensatory and punitive damages.  JA2671.

## D.  The District Court Denies Sudan's Belated Attempts To Evade The Judgments.

Shortly after the district court's first final judgment, Sudan reappeared and filed notices of appeal.  One year later, Sudan moved the district court to vacate the judgments under Rule 60(b).  JA2672.  This Court stayed the consolidated appeals pending resolution of the motions to vacate.  Order (Dkt.1563726).

The district court denied Sudan's motion to vacate in all respects.[4]  The court first held that Sudan's failure to participate in this litigation was not "excusable neglect."  JA2673-82.  Sudan was absent for nearly five years, and this

---

[4]  The United States declined the invitation to file a statement of interest.  JA2672.

"extraordinary amount of delay" was not justified given that "Sudan was well aware of these cases and yet did nothing."  JA2675.  "Equally unavailing" was Sudan's argument that domestic turmoil justified vacatur, especially when Sudan's government *caused* much of that strife.  JA2680-81.  "The idea that the relevant Sudanese officials could not find the opportunity over a period of *years* to send so much as a single letter or email communicating Sudan's desire but inability to participate in these cases is, quite literally, incredible."  JA2676-77.

The district court also rejected Sudan's various arguments that the judgments were void for lack of jurisdiction.  JA2682-83.  The court held that the embassy bombings were "extrajudicial killing[s]" as defined in the FSIA because they were "deliberated" "killing[s]" that were not "authorized by the judgment of any court" or "permissible under international law."   JA2683-84.  The court rejected, as contrary to the statutory text, Sudan's argument that "extrajudicial killing" covers "only killings by state actors," and not "'broad-based terrorist attack[s].'"  JA2684-88.

As to Sudan's evidentiary objections regarding causation, the district court concluded that, for Plaintiffs asserting federal claims under §1605A(c), no further inquiry was necessary under this Court's cases because "the jurisdictional and merits inquiries fully overlap."  JA2701-07.  For Plaintiffs asserting only state-law claims, the district court rejected Sudan's sufficiency challenge because the

13

evidence established causation.  JA2709-19.  The expert testimony and other evidence showed that al-Qaeda could not have carried out the bombings had Sudan not "actively assisted and participated in al Qaeda terrorist activities," and that "Sudan supplied al Qaeda with important resources and support during the 1990s knowing that al Qaeda intended to attack the citizens, or interests of the United States." JA2713-14.

The court also held that §1605A, by its plain language, provides subject-matter jurisdiction for claims of immediate family members of bombing victims asserting emotional injuries, if either the claimant *or* the victim is a U.S. citizen, employee or servicemember.  JA2719-23.

The court further held that none of the claims was barred by the FSIA's statute of limitations.  JA2446.  "There is no clear statement" in the FSIA that the limitations period is jurisdictional, nor any "history of this provision being treated as jurisdictional."  JA2447.  And under the plain language of the limitations provisions, all Plaintiffs timely asserted their claims.  JA2446.

Finally, the district court rejected Sudan's array of undisputedly nonjurisdictional arguments concerning punitive damages and state-law requirements for family-member plaintiffs' claims.  JA2476.  Sudan "completely fail[ed] … to explain why these nonjurisdictional arguments, even if correct, would justify relief under Rule 60(b)(6)."  JA2476.

## SUMMARY OF ARGUMENT

**I.**     The district court correctly concluded that the embassy bombings were acts of "extrajudicial killing" under 28 U.S.C. §1605A(a)(1).  "[E]xtrajudicial killing" is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court."  Torture Victim Protection Act of 1991 section 3(a), 28 U.S.C. §1350 note.  This definition unambiguously covers premeditated acts of mass killing not authorized by legal process—including the embassy bombings.  The legislative history of §1605A and its predecessor further confirm that Congress intended to allow claims involving terrorist bombings.

**II.**     The district court properly rejected Sudan's belated attack on the sufficiency of the evidence that its material support for al-Qaeda proximately caused the bombings.  Appellate review of this issue is narrowly circumscribed. Review is limited to whether the district court complied with 28 U.S.C. §1608(e), or, at most, review for clear error.

Under any standard of review, the evidence amply established that Sudan's material support for al-Qaeda proximately caused the bombings.  The district court's findings were based on voluminous record evidence, including detailed expert reports and testimony of a high-ranking al-Qaeda operative.  Sudan's sundry attacks on individual subsidiary findings and evidence lack merit, as does its core

thesis that its extensive support for al-Qaeda was not a proximate cause of the embassy bombings.

**III.**    The district court correctly determined that indirect victims of extrajudicial killings can sue under §1605A, and that the foreign-national family members' claims for intentional infliction of emotional distress are valid under District of Columbia law.  Section 1605A(a) expressly allows claims by either "the claimant *or* the victim," unambiguously allowing claims by persons other than direct victims.  (Emphasis added.)  Family-member claims have been part of virtually every case filed under the terrorism exception.  Whether family members are physically present at the bombings is also irrelevant; terrorist attacks are precisely the sort of acts for which physical presence is not required in light of the intention to cause widespread, severe grief and distress.

**IV.**    The district court correctly held that the *Opati*, *Aliganga*, and *Khaliq* Plaintiffs timely filed their actions.  Section 1605A(b) contains no clear statement making the limitations period jurisdictional, so it is not; statute of limitations is an affirmative defense, waived by default.  In any event, all of Plaintiffs' claims were timely filed.

**V.**    The district court correctly held that §1605A permits punitive damages.  Congress clearly intended that punitive damages can be awarded for conduct occurring prior to the provision's enactment.  The punitive damages bar in

§1606 is irrelevant to Plaintiffs' punitive-damages claims because that provision does not apply to claims brought under §1605A.

**VI.**   The district court did not abuse its discretion by declining to vacate the judgments based on excusable neglect.  Sudan's refusal to defend these cases was due to "deliberate choice or inexcusable recklessness."  JA2416.  Vacating the judgments now would cause significant prejudice to Plaintiffs, including "a serious likelihood of lost witnesses, memories, and documentary evidence," and that more Plaintiffs will die while Sudan belatedly litigates.

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*.  Thus, this Court reviews *de novo* the district court's assertion of subject matter jurisdiction over Plaintiffs' claims, except that the district court's findings of fact are reviewed for clear error, bearing in mind that Plaintiffs' obligation is simply to present evidence that their claim falls within the §1605A(a)(1) exception.  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004).

Because Sudan defaulted, its liability was determined in accordance with 28 U.S.C. §1608(e), which provides that a default judgment may be entered if "the claimant establishes his claim or right to relief by evidence satisfactory to the court."  This Court's review of such a judgment is limited to determining whether "the district court … was satisfied with the evidence submitted in support of the

Plaintiff's claims." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994).

Sudan's challenges to the district court's refusal to vacate the judgments under Rules 60(b)(1) and (2) are reviewed for abuse of discretion. *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838 (D.C. Cir. 2006).

## ARGUMENT

Where a sovereign defendant chooses not to appear, it risks a default judgment. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987). Although the defendant may later challenge the jurisdictional basis of the default judgment, if he loses that challenge, "his day in court is normally over [and] he ordinarily forfeits his right to defend on the merits." *Id.*; *see Flanagan v. Islamic Republic of Iran*, No. 10-1643 (RC), 2016 WL 3149560, at *5 (D.D.C. June 3, 2016). The loss of its "chance to argue the merits of the suit" is precisely what the sovereign puts at risk in choosing to default. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1181 (D.C. Cir. 2013).

These principles barring belated challenges on the merits by a defaulting sovereign apply especially forcefully here. Sudan appeared, participated in the litigation, and then purposely defaulted. Having done so, Sudan chose not to timely present its objections to the district court. As the district court observed, a

18

sovereign that employs that tactic is subject to the basic rule that absent, a timely objection in the district court, a litigants' arguments on non-jurisdictional points are "forfeit on appeal." *See* JA2480-81.

A few of Sudan's legal arguments on appeal are jurisdictional—e.g. whether terrorist bombings are extrajudicial killings under §1605A(a)(1), or whether only "legal representatives" can be "claimants" under §1605A(a)(2). The remainder— e.g. about the ability of foreign claimants to maintain state law claims, punitive damages, and statute of limitations (an affirmative defense, waived here)—are not, and this Court should not entertain them.

This distinction might be of greater moment if Sudan's legal arguments had merit. But each of them—jurisdictional or non-jurisdictional—is squarely contrary to statutory language, consistent precedent, and Congress's intent.

## I.    Terrorist Bombings Intended To Kill, And Which Do In Fact Kill, Are Extrajudicial Killings.

The 1998 embassy bombings were "extrajudicial killing[s]" within the plain meaning of §1605A. Sudan's attempts to avoid that conclusion are contrary to the statutory text, its history, longstanding precedent, and Congress's manifest intent.

### A.    The Unambiguous Language Of Section 1605A Includes Terrorist Bombings That Produce Mass Killings.

The "[t]errorism exception" in §1605(A)(1), like its predecessor in §1605(a)(7), confers jurisdiction over claims for:

> injury or death … caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.

Section 1605A(h)(7) assigns the term "extrajudicial killing" the meaning it has in

section 3 of the Torture Victim Protection Act of 1991 ("TVPA"):

> a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

TVPA section 3(a), 28 U.S.C. §1350 note.

This definition unambiguously covers premeditated acts of mass killing, such as the embassy bombings, that were not judicially authorized. "[W]hen the statute's language is plain," and the result is not absurd, "the sole function of the courts . . . is to enforce it [the statute] according to its terms.'" *See Goldring ex rel. Anderson v. District of Columbia*, 416 F.3d 70, 74 (D.C. Cir. 2005). Sudan does not and cannot argue that it is "absurd" to treat embassy bombings as "deliberated," judicially unauthorized "killing[s]." That should be the end of the matter.

Instead, Sudan asks this Court (at 16) to import into the statute additional requirements to limit extrajudicial killings only to "summary executions," and only when carried out by state actors. But the TVPA's definition of extrajudicial killing (which §1605A(h)(7) incorporates) contains no such limitations. The TVPA's state-actor requirement is located in another section defining a cause of action,

20

TVPA section 2(a), 28 U.S.C. §1350 note, which §1605A does *not* reference.  The TVPA's structure thus mirrors that of the FSIA.  Both statutes identify the state role needed to establish liability—in the FSIA, direct state involvement or providing "material support or resources"—but define "extrajudicial killing" in a *separate* section, without reference to any state role.

"Had Congress wished to limit extrajudicial killings under the FSIA to those perpetrated directly by state actors," Congress easily "could have cross-referenced" the TVPA's state-actor requirement.  JA2438-39.  "But it did not," because "Congress clearly wanted to permit liability both when states themselves perpetrate the predicate acts and also when they help others do so."  JA2439.  Applying the TVPA's definition of "extrajudicial killing" is also "more consonant with the overall thrust of §1605A—namely, to render designated state sponsors of terrorism liable for directly perpetrating or materially supporting the predicate acts."  JA2439.

Sudan's argument that states should not be held liable under §1605A for materially supporting mass killings makes no sense in light of the statute's application to "aircraft sabotage," which (as Congress well knew) is often perpetrated by terrorists.  On Sudan's view, states can be liable under §1605A for materially supporting terrorists who bomb an airplane, but not for supporting those who bomb a bus, a ship, or an embassy.  That illogical result has no basis in the

text and would "create obvious incongruities," and thus cannot be deemed Congress's design. *See*, *e.g.*, *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206-07 (2009) (collecting cases).

### B.     The FSIA's Legislative History Cannot Trump The Clear Statutory Text; Indeed, It Further Undermines Sudan's Position.

Sudan has no answer to the statute's plain language, and accordingly retreats (at 17-25) to legislative history, which it claims reflects a congressional purpose to codify a much narrower principle purportedly drawn from international law.  The FSIA's and TVPA's pellucid text make resort to legislative history unnecessary, *see Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1709 (2012), and inappropriate, *see Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) (refusing to "allo[w] ambiguous legislative history to muddy clear statutory language").  In any event, that history further refutes Sudan's reading.  Congress codified not a norm of international law, but a well-settled federal-court consensus that confirms the text's plain meaning.

### 1.     Congress Intended The Terrorism Exception To Cover Terrorist Bombings.

"Congress is presumed to be aware of" settled "judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009).  Courts accordingly

interpret statutes to accord with "the rulings of the great majority of the lower federal courts" extant when a statute was amended. *Manhattan Properties v. Irving Trust Co.*, 291 U.S. 320, 336 (1934); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010); JA2443-44.  Numerous cases brought under §1605(a)(7) were premised on terrorist bombings, including embassy bombings, and uniformly held that terrorist bombings could be extrajudicial killings redressable under the FSIA. *See*, *e.g.*, *Dammarell v. Islamic Republic of Iran*, 281 F.Supp. 2d 105, 108 (D.D.C. 2003); *Wagner v. Islamic Republic of Iran*, 172 F.Supp. 2d 128, 133-34 (D.D.C. 2001); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998).

Congress reacted to these rulings not by limiting the statute, but by reinforcing it.  In 2000, Congress established a mechanism to compensate victims of Iranian terrorism, including victims of two bus bombings and one embassy bombing.  Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, §2002(a)(2)(A), 114 Stat. 1464, 1542 (2000) (compensation for individuals with final judgments and plaintiffs who "filed a suit under such section 1605(a)(7) on" five specific dates, including "July 27, 2000," the date *Wagner v. Islamic Republic of Iran* was filed); *see* H.R. Rep. 106-939 (2000), at 116 (citing bombings in *Flatow* and other cases); 153 Cong. Rec. 22,665 (2007) (bill's sponsor stating that bill would address Beirut Marine Barracks terrorist bombing); 154 Cong. Rec. S54-01 (2008) (same for discotheque bombing in Germany).

23

By 2008, "the unmistakable and unanimous judicial reading of §1605(a)(7) … was that its use of 'extrajudicial killing' encompassed terrorist bombings of this kind," and this was "hardly hidden from Congress." JA2443. Numerous cases—many involving "the most infamous terrorist attacks of the late 20th century," including embassy bombings—had held, unanimously, that terrorist bombings are extrajudicial killings under the FSIA. JA2443-44; 176 A.L.R. Fed. 1 §5 (collecting cases).

In enacting §1605A in 2008, Congress "chose to use the *same* language to define the *same* four predicate acts that §1605(a)(7) had covered." JA2445. Congress's incorporation of that language reflects its intent to ratify the unanimous judicial construction of §1605(a)(7), confirming that §1605A reaches terrorist bombings.[5] *See Forest Grove*, 557 U.S. at 239-40.

### 2. Sudan Misreads The Legislative History And International-Law Principles That Congress Supposedly Incorporated.

Sudan has no answer to the judicial consensus that §1605A incorporated, and instead asserts (at 17-18) that the *TVPA's* legislative history shows that

---

[5] Even more recently, Congress created the United States Victims of State Sponsors of Terrorism Fund, allowing judgment holders to receive compensation through a congressionally-created fund. 42 U.S.C. §10609.

Congress meant to codify a narrow view of extrajudicial killing derived from international law. That contention is meritless.

Sudan's claim that the TVPA's definition of extrajudicial killing "incorporate[d]" international-law norms has no basis in the statute. The TVPA's definition invokes international law only in an exception clarifying that "extrajudicial killing" *excludes* a government killing that, "under international law, is lawfully carried out under the authority of a foreign nation"—i.e., acts of war. TVPA section 3(a), 28 U.S.C. §1350 note. Nor did Congress borrow language with a well-settled international-law meaning. The TVPA does *not* adopt verbatim the provisions of the Geneva Conventions that equate extrajudicial killing with "summary execution," and instead *changes* a key phrase from the Geneva Conventions. Common Article 3(1)(d) proscribes "the carrying out of executions without" legal process. *See* Geneva Convention Relative to the Treatment of Prisoners of War art. 3(1)(d), Aug. 12, 1949, 6 U.S.T.S. 85. Yet the TVPA substitutes for "executions" the broader "deliberated killing." TVPA section 3(a), 28 U.S.C. §1350 note.

Sudan is forced to rely (at 17-21) on isolated statements in floor colloquies and committee reports, and the TVPA's general aim of fulfilling the United States' obligations under various treaties, to contend that Congress meant to import an international-law definition of extrajudicial killing into the FSIA. But even if those

25

statements could overcome the FSIA's text (and they cannot), international law contradicts Sudan's theories.

Sudan's own sources show that non-state actors *can* commit an "extrajudicial killing."  A different provision of Common Article 3 prohibits killings *of any kind* without benefit of judicial process—encompassing not only executions, but also "violence to life and persons, in particular murder of all kinds."  Art. 3(1)(a), Aug. 12, 1949, 6 U.S.T. 3316.  The U.N. Terminology database's definition of "extrajudicial killing" also "does not include a state-actor requirement, and in fact encompasses '[k]illings committed … by vigilante groups.'"  JA2438.  Similarly, the U.N.'s 1980 resolution on "extra-legal executions," cited by Sudan (at 18) condemned murders "by paramilitary or political groups acting with the tacit or other support of" the government.  And the U.N.'s Special Rapporteur' "Handbook" contains an entire chapter on "Killings by non-state actors and affirmative State obligations."  JA2438.

Sudan finally asserts (at 21-22) that, when Congress enacted §1605(a)(7), it "rejected a draft Senate bill that proposed 'an act of international terrorism' as a predicate act for withdrawing sovereign immunity."  Rather than base the withdrawal of immunity on potentially difficult to define or shifting notions of "terrorism," Congress specified the prohibited acts, including extrajudicial killing, with definitions that courts could readily apply.  That Congress did not then seek to

26

encompass all acts of terrorism is "irrelevant":  "[A]ll that matters" is that the "bombings fit within the FSIA's definition of 'extrajudicial killing,'" JA2442. "That [the bombings] can also be called 'terrorism' does not pull them out." JA2442.

## II.    Sudan's Belated Challenges To Causation Do Not Overcome The District Court's Detailed Factual Findings.

### A.    The District Court Made The Requisite Causation Findings For All Plaintiffs.

The district court found in 2011, based on an extensive review of the voluminous record, that Sudan provided material support to al-Qaeda that caused acts of extrajudicial killing—a finding applicable to all Plaintiffs.  JA407-13.  Four years later, Sudan, despite deliberately refusing to attend the hearing or contest Plaintiffs' evidence, belatedly urged the district court to reconsider.  The court, after painstakingly reviewing the record again, reaffirmed its prior findings, again for all Plaintiffs.  JA2461-71.

On appeal, Sudan effectively asks this Court to disregard those findings and start over yet again.  Appellate review of the district court's findings and evidentiary rulings, however, is narrowly circumscribed.  Moreover, although the district court correctly held that at least as to the federal claimants, no further review was required, JA2454-61, it did not stop there.  Instead, after making across-the-board causation findings in its 2011 opinion, JA407-13, the court in its

2016 opinion again made causation findings applicable to *all* Plaintiffs. JA2456, 2461-71. These causation findings are unassailable under any standard of review. The evidence amply demonstrates that Sudan's material support for al-Qaeda proximately caused the embassy attacks.[6]

### B.   Appellate Review Of The District Court's Causation Findings Is Narrowly Circumscribed.

Indeed, Sudan acknowledges at the outset (at 15) that factual findings can be overturned only if clearly erroneous. Nonetheless, Sudan spends one-third of its brief urging this Court (at 25-47) to ignore the discretion of the fact finder and to reach its own, independent conclusions. Sudan's bid for a do-over is baseless. The district court's causation findings are reviewable either on the same standards applicable to any §1608(e) appeal by a defaulting defendant, or, at most, for clear error—the same standard for any other finding of fact.

---

[6] Sudan argues (at 44-45) only that the district court "erred by concluding that *certain plaintiffs*"—those with a federal claim under §1605A(c)—"need not prove jurisdictional causation." Though Sudan quarrels with the district court's factfinding, it does *not* argue that the district court failed to employ the proper procedural mechanism to respond to Sudan's belated challenge to causation, including by making a "jurisdictional causation" determination as to Plaintiffs asserting state law claims.

1.    **For Section 1605A(c) Claims, There Was No Need For A Separate Jurisdictional Review And The District Court's Findings Are Reviewable Only Under Section 1608(e).**

The district court correctly held that under this Court's precedents, its initial determination that the federal-claim Plaintiffs had sufficiently supported their claims on the merits (and jurisdictionally) was all that was required because the merits determination precisely mirrored the jurisdictional determination under §1605A(a)(1).   JA2459-60.   Sudan challenges that conclusion, arguing that the district court could not exercise jurisdiction based on Plaintiffs' allegations even as to Plaintiffs asserting claims under §1605A(c).   Sudan's contention misreads this Court's case law, but ultimately makes no difference:   Even if the district court *were* required to make findings on causation as to claims under §1605A(c), the court made exactly those findings—twice finding causation established as to *all* Plaintiffs.

a.    This Court made clear in *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008)(*"Chabad"*), that where federal "jurisdiction depen[d] on the plaintiff's *asserting a particular type of claim*," jurisdiction exists so long as the plaintiff alleges that type of claim and his allegations are not "wholly insubstantial and frivolous." *Id.* at 940 (emphasis added); *see also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 811-12 (D.C. Cir. 2012).   This Court confirmed in *Simon*

29

*v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), that *Chabad*'s common-sense principle applies where the "jurisdictional and merits inquiries fully overlap," *i.e.*, "the plaintiff's claim on the merits directly mirror[s] the jurisdictional standard," and the "same showing" suffices for both. *Id.* at 140-41.

These precedents leave "no doubt that the [district court] had subject-matter jurisdiction over the claims brought under § 1605A(c)." JA2459. Section 1605A(a) expressly makes jurisdiction turn on "the plaintiff's asserting a particular type of claim," *Chabad*, 528 F.3d at 940—namely, one "in which money damages are *sought* against a foreign state for personal injury or death that was caused by an act of … extrajudicial killing … or the provision of material support or resources for such an act." 28 U.S.C. §1605A(a)(1) (emphasis added). And the showing required to prevail on the merits in §1605A(c) "fully overlap[s]" with, JA2459— indeed, expressly incorporates—the showing §1605A(a) requires for jurisdiction.[7] *Simon*, 812 F.3d at 140.

---

[7] The district court contrasted jurisdiction involving the type of claim, under §1605A(a)(1), with what it called "traditional 'jurisdictional facts,'" in §1605A(a)(2). JA2456-57. Other courts have suggested that some §1605A(a)(2) requirements are *not* all independently jurisdictional, simply part of the claim. *See Flanagan* at *17, n.15 (expressing doubt that §1605A(a)(2)'s nationality requirements are jurisdictional).

Sudan disputes this straightforward conclusion, but it misreads this Court's cases. It argues (at 44-45) that under *Kilburn*, 376 F.3d 1123, there must be special proof of causation. But, as Sudan admits, *Kilburn* dealt not with §1605A(a), but its "predecessor," §1605(a)(7), which differed from §1605A(a) in the very respect *Simon* held crucial. Section 1605(a)(7) was *solely* a jurisdictional provision; it did *not* contain the fully overlapping federal cause of action currently found in §1605A(c). The *Kilburn* plaintiff was "necessarily going to rely on a substantive cause of action from some other source of law … that would not neatly overlap with the jurisdictional grant in §1605(a)(7)." JA2458. Similarly, in *Simon*, which Sudan cites (at 46), this Court held that the "jurisdictional and merits inquiries d[id] *not overlap*." 812 F.3d at 141 (emphasis added). *That* was why the Court noted that, if the jurisdictional facts were genuinely disputed, the district court would have to resolve them. *Id.* at 144. Neither *Kilburn* nor *Simon* has any bearing on claims under §1605A(c), where the merits and jurisdictional questions *are* coterminous. At any rate, *Kilburn* provides only limited guidance here, as it was a contested case, addressing the inquiry at the Rule 12(b) stage, and so did not address the circumstance here, where the sovereign defaulted and the district court properly addressed Plaintiffs' evidence in a §1608(e) proceeding.

**b.**    Sudan's challenge to the §1605A(c) Plaintiffs' proof of causation is thus inextricably bound up with the *merits*, and appellate review is narrowly

circumscribed by 28 U.S.C. §1608(e). Once an FSIA defendant "loses on [any] jurisdictional issue[s]," its "day in court is normally over" because it "forfeit[ed] [its] right to defend on the merits." *Practical Concepts,* 811 F.2d at 1547. The only added protection Congress afforded defaulting FSIA defendants is §1608(e), which provides that, before default judgment can be entered, the court must find that the plaintiff "establishe[d] his claim or right to relief by evidence *satisfactory to the court*." 28 U.S.C. §1608(e) (emphasis added).

Section 1608(e)'s language confers broad discretion and leaves little if any room to second-guess the district court's findings. As every Circuit to address the issue has explained, a default judgment under the FSIA "should be affirmed so long as 'there is an adequate basis in the record for inferring that *the district court … was satisfied* with the evidence submitted' in support of the plaintiff's claims." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (emphasis added); *Antoine v. Atlas Turner, Inc*., 66 F.3d 105, 111 (6th Cir. 1995) (declining to express an "opinion on the adequacy" of the evidence). Even *Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, relied on by Sudan (at 46), held only that a default judgment could be vacated where the district court failed to conduct any §1608(e) inquiry on liability. 88 F.3d 948, 951 (11th Cir. 1996). Plaintiffs are not aware of any court that has allowed a

defaulting sovereign to challenge factual findings on appeal where the district court performed the §1608(e) analysis.

There is no dispute that the district court here discharged its duty and found Plaintiffs' proof of causation "satisfactory." JA2461-71. Sudan does not dispute that the court conducted a *bona fide* §1608(e) inquiry or that it "was satisfied with the evidence submitted."" *Rafidain Bank*, 15 F.3d at 242. That should be the end of the analysis.

At the very most, appellate review of the district court's §1608(e) determinations should entail only whether the district court abused its broad discretion. Even *non*-defaulting FSIA plaintiffs, who participate fully and preserve proper objections, are entitled only to abuse-of-discretion review of §1608(e) findings. *See Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). Defendants like Sudan who default—and thus fail to make objections to evidentiary rulings, and prevent plaintiffs from obtaining discovery—cannot demand *more* searching appellate review. A contrary view would undermine Congress's "ai[m] to prevent state sponsors of terrorism"—"entities particularly unlikely to submit to this country's laws"—from refusing to appear in court or participating in discovery to "escap[e] liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). The district court's factual determinations, if reviewable at all, are thus reviewable

33

at most for abuse of discretion and in any case, factual findings must be affirmed unless "clearly erroneous." *Amador Cty v. U.S. Dep't of Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014).

## 2. The District Court's Causation Findings For State-Law Claims Are Reviewable At Most Only For Clear Error.

As to Plaintiffs asserting only state-law claims, the district court found those claims do not perfectly "'mirror' the jurisdictional standard"—i.e., proving the state-law claims might not establish every jurisdictional prerequisite of §1605A(a)(1). JA2706-09. Accordingly, the district court believed that it was required to re-examine the evidence to ascertain jurisdiction. *Id.*

This was not necessary. Whether the state-law claims fully overlapped with §1605A(a) should have made no difference because the district court had earlier determined that Plaintiffs had properly supported every element of their §1605A(a)(1) claim. *Kilburn* and *Simon* addressed the jurisdictional proof required in a contested case when the sovereign raises a factual issue touching on jurisdiction early in the proceedings. Neither case addressed how §1605A(a)(1) issues are to be resolved if the sovereign defaults. Moreover, in this case, proving the state law claims on the merits necessarily established the only requirement of §1605A(a)(1) that Sudan challenges here: that Sudan's conduct proximately caused the bombings. This Court need not address those issues in this case, however, because even on the district court's reading of this Court's precedent,

Sudan's challenges to the district court's causation findings fails for multiple reasons. And to the extent that *Simon* and *Kilburn* are understood to require a special re-examination of the state law claims at this stage of the proceedings, Plaintiffs respectfully disagree with those decisions.

In any event, Sudan's own authority establishes that Plaintiffs merely had to produce evidence to satisfy the initial burden of production. JA2710. Sudan bore the "ultimate burden of persuasion" as to whether the case falls "within a statutory exception to immunity." *Kilburn*, 376 F.3d at 1131 (internal quotation marks omitted). When an FSIA defendant "submit[s] no evidence whatsoever to show that they fall outside the terrorism exception" and instead merely attacks the plaintiff's evidence, it is "plain" that the sovereign has not satisfied its "required burden of persuasion." *Id*. at 1132. Sudan never attempted to carry its burden. Sudan's challenge to jurisdiction over the state-law claims fails on that ground alone.

In fact, the district court here twice determined that Plaintiffs proved causation. In 2011, the court exhaustively examined the evidence of causation and concluded that Sudan's material support for al-Qaeda proximately caused the bombings. JA384, 388-416. In ruling on Sudan's Rule 60(b)(4) motion, the district court reviewed the evidence *again* and reaffirmed its earlier findings. JA2709-10.

35

This Court's review of the district court's findings is narrowly limited. And indeed, Sudan itself concedes (at 15) that these findings must be sustained unless clearly erroneous. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004) (court "review[s] the district court's findings of fact—including facts that bear upon immunity and therefore upon jurisdiction [under the FSIA]—for clear error"); *accord Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 280 (D.C. Cir. 2014). *See also Goetz v. Synthesys Techs., Inc.*, 415 F.3d 481, 483 (5th Cir. 2005) (on review of disposition of a motion assailing a judgment as void for lack of jurisdiction, appellate courts "review the district court's findings of fact" only "for clear error"); *accord Central Vermont Public Service Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003). *De novo* review is restricted to issues *not* "committed to the discretion of the district court," *i.e.* issues of law, not fact. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1179 (D.C. Cir. 2013). Indeed, clear-error review would apply even if Sudan had *not* abandoned the case. *See Price*, 389 F.3d at 197. Sudan cannot help itself to more searching review by waiting to contest the district court's factual findings only in a Rule 60(b) motion years later.

### C. The Record Amply Supports The District Court's Findings That Sudan's Material Support Proximately Caused The Bombings.

However Sudan's thirteenth-hour attacks on the sufficiency of the evidence are characterized, they fail under any plausible standard of review. The record

overwhelmingly supports the district court's finding that Sudan's material support of al-Qaeda proximately caused the 1998 bombings.

      **1.**    The district court's findings followed a three-day evidentiary hearing and were based on voluminous record evidence—including (*inter alia*) detailed reports of multiple highly-qualified expert witnesses (a former high-ranking U.S. official involved in monitoring the relevant events and two experts on al-Qaeda and Islamic terrorism, JA207-08, 258, 366, 827-29, 862-67); sworn trial testimony of a high-ranking al-Qaeda operative offering a rare inside view of a highly secretive terrorist organization; and various declassified CIA and State Department records.  JA383, 393, 395-97.  Taken together, the district court found, this evidence demonstrated that Sudan provided material support that proximately caused the embassy attacks.  JA2709-19.

      The evidence showed that Sudan actively courted numerous Islamic terrorist organizations to relocate to Sudan, hoping they would unite to plan worldwide Jihad against the West.  JA265-70, 367, 392-97, 803-07, 831-41.  Sudan specifically courted al-Qaeda (knowing it was a militant Jihadist group), which accepted Sudan's overtures, moving its base of operations to Sudan and establishing weapons and explosives training camps there.  JA266, 366-70, 394-400, 833-34, 843.  Sudan provided al-Qaeda with extensive support—from helping set up false companies to launder money and provide cover, to giving tax and

customs privileges, false passports, and new identities, to providing the assistance of its military, security forces, and intelligence service, which facilitated al-Qaeda's transport of weapons and even acted as personal guards for bin Laden. JA286-89, 318-19, 396-401, 411-12, 841, 863.   President al-Bashir's letter, moreover, allowed al-Qaeda operatives to travel throughout Sudan without interference by any Sudanese authorities.  JA276-77.

The record further showed that Sudanese officials helped create the terrorist networks that led directly to the attacks.  JA395-96, 402-03.  Al-Qaeda planned and conducted the embassy attacks (and other assaults) from its Sudanese base. JA297-98, 395-96, 402-03.   Sudanese intelligence services helped al-Qaeda transport operatives and funds to the Nairobi terror cell, JA308-09, and gave al-Qaeda weapons and explosives.  JA304.  All three experts agreed that al-Qaeda would not have been able to carry out the bombings without Sudan's support. JA351 (Kohlmann); JA866-67 (Simon); JA860-61 (Vidino).

Sudan does not seriously contest that these acts constitute material support. It halfheartedly claims (at 38-41) that certain acts, viewed in *isolation*—such as providing passports, security guards, assistance in navigating customs, or lax airport security—were innocent.  But courts do not analyze each fact individually. "Each piece of evidence need not be conclusive," because "[a] brick is not a wall."

*United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993).  The court quite appropriately viewed Sudan's actions collectively.

**2.**    Sudan does dispute the causal link between its support of al-Qaeda and the embassy bombings, but its contention distorts Plaintiffs' burden and the record.  As Sudan admits (at 28-29), §1605A requires only *proximate* causation, i.e., "'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'"  *Kilburn*, 376 F.3d at 1128 (citation omitted).    Plaintiffs' injuries need only have been "reasonably foreseeable" or "anticipated as a natural consequence."    *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013).

Moreover, where (as here) the foreign-state defendant refuses to appear, the FSIA does not "requir[e] that the [plaintiffs] prove exactly what happened"; that "would defeat the [FSIA's] very purpose" of compensating victims of terrorism and punishing state sponsors of terror, as "few suits like this could ever proceed, and state sponsors of terrorism could effectively immunize themselves by … refusing to appear in court."  *Kim*, 774 F.3d at 1048.  Rather, "courts have the authority—indeed, … the obligation—to adjust evidentiary requirements to differing situations."  *Id.* (internal quotation marks, ellipsis, and brackets omitted). In *Kim*, for instance, the Court concluded that North Korea tortured and killed the victim based largely on affidavits of two expert witnesses.  *Id.* at 1049.

The evidence demonstrated not only that Sudan "reasonably foresaw" that its support would lead to terror attacks, but that such attacks were Sudan's *affirmative aim*. Sudan opened its doors to terror groups of all stripes to foment a global jihadist movement, seeking to make "'Sudan a place from which worldwide Islamic revolution could flow.'" JA386 (quoting JA230).

**3.**     Unable to refute the district court's finding that this evidence together proves proximate causation, Sudan assails subsidiary findings piecemeal, primarily challenging the admissibility of individual items. Of course, the reason the court did not consider Sudan's objections at the hearing, when they might have been addressed, was that Sudan chose not to attend that hearing to raise them. Sudan's cavils are far too little, far too late.

Sudan faults the district court for relying on Plaintiffs' experts. Sudan specifically claims (at 26-27) that the court erred by not making evidentiary rulings on each factual premise of each expert opinion. But the Federal Rules of Evidence impose no such requirement. Rule 702's aim is to ensure that the "opinions must be helpful to the trier of fact." *United States v. Hall*, 969 F.2d 1102, 1110 (D.C. Cir. 1992). Where, as here, "[t]he district court was the sole factfinder in this case," the court is "particularly well-suited to make the determination as to whether expert testimony would be helpful." *Id.* Sudan's contention that some of the experts' factual premises were not well-founded—even if correct, which it is not—

40

is similarly misdirected. As this Court has held, the "admission" of expert testimony "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993).

Sudan also contends (at 31-32) the district court improperly relied on subsidiary facts described by the experts, treating their analyses as testimony by "percipient witnesses." But Sudan misunderstands the reports' role in the district court's analysis. The court relied on "the experts' ultimate *conclusions*—that is, their expert opinions," JA2715 (emphasis added), which is indisputably proper. Even *Marvel Characters, Inc. v. Kirby*, cited by Sudan, had "no doubt" that an "historian's specialized knowledge could potentially aid a trier of fact in an appropriate case." 726 F.3d 119, 135-36 (2d Cir. 2013); *see also Farhane*, 634 F.3d at 159 (admitting Kohlmann's testimony "about al-Qaeda's history and structure").

To be sure, the experts explained (and the court recited) various subsidiary facts supporting their conclusions. But Rule 703 expressly permits experts to "base [their] opinion[s] on facts or data in the case that [they] ha[d] been made aware of." Neither case law nor common sense requires that those facts or data themselves be independently admissible. A contrary view "would be a crippling limitation because experts don't characteristically base their expert judgments on

41

legally admissible evidence." *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 704 (7th Cir. 2008). Just as "[b]iologists do not study animal behavior by placing animals under oath," "students of terrorism" "do not arrive at their assessments solely or even primarily by studying the records of judicial proceedings." *Id.* Thus, while Sudan has "spill[ed] a great deal of ink" "attacking as inadmissible hearsay particular statements the experts made in the course of explaining the bases for their opinions," those attacks on "statements along the way [are] irrelevant if," as the district court concluded, "the ultimate opinions themselves are sufficient." JA2715. In any event, given the qualifications of these three experts, their knowledge of al-Qaeda's history and interaction with Sudan is sufficient foundation for all the testimony elicited during trial.[8]

**4.** Sudan quibbles with a handful of particular findings. None provides any basis for overturning the district court's detailed findings and ultimate conclusions.

Sudan asserts (at 29-30) that al-Qaeda was not yet known as a terrorist group when Sudan invited the group to relocate. But Sudan's leaders knew of bin

---

[8] Mr. Simon, moreover, could in fact testify as a percipient witness, as he served on the National Security Council for counter-terrorism operations at the time relevant to this case. JA862-67.

Laden's mission to bring about global Jihad; indeed, that was the reason Sudan reached out to al-Qaeda in the first place.  JA833-34.  And Sudan certainly was aware of al-Qaeda's terrorist aims after al-Qaeda's attacks on U.S. forces in the Battle of Mogadishu in 1993, JA297-302, yet continued to provide ample support for years thereafter.

Sudan also protests (at 30-31) that the letter from President al-Bashir was never offered as evidence in the case.  That is irrelevant.  A document need not be admitted as evidence for expert witnesses to explain its existence and implications.  *See*, *e.g*., *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., 608 F.3d 871, 895 (D.C. Cir. 2010).  All three experts cited al-Fadl's U.S. criminal-trial testimony as a source for their testimony regarding the invitation to al-Qaeda.

Sudan also claims (at 37-38) that al-Bashir's letter is not probative because it was innocently addressed to al-Qaeda's front company, Wadi al Aqiq.  The district court sensibly saw through that façade.  "[F]oreign terrorist organizations do not maintain" commercial "firewalls between funds raised for" lawful conduct "and those used to carry out terrorist attacks."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 5 (2010).  Sudan cannot hide behind the veil of terrorist groups' superficial corporate form.

Sudan finally argues (at 32) that al-Fadl's testimony, in a prior federal criminal trial, was inadmissible hearsay.[9]   Sudan cannot complain about its inability to cross-examine a declarant at a hearing Sudan refused to attend.  In any event, this Court has deemed admissible prior sworn testimony such as affidavits at §1608(e) evidentiary hearings, and found it sufficient to support an FSIA default judgment.  *Kim*, 774 F.3d at 1049-51; *see Antoine, Inc*., 66 F.3d at 110-111; JA2718.  Moreover, al-Fadl is in a witness-protection program, *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 141 (2d Cir. 2008), and unavailable to testify; his testimony was admissible under Federal Rule of Evidence 805(a)(5)(A).  Finally, under Federal Rule 807 his testimony is admissible under the residual hearsay exception because it is "very important and very reliable." *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997).

*****

The record as a whole makes one conclusion inescapable:  Sudan materially supported al-Qaeda throughout the 1990s, knew about its terrorist aims, and enabled the terror group to plan and carry out the 1998 embassy attacks.

---

[9] Sudan argues (at 36) that the CIA and State Department reports are hearsay, but such documents are admissible as public records.  FRE 803(8)(A); *see e.g.*, *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

### III.   Sudan's Challenges To Family-Member Plaintiffs' Claims Lack Merit.

Having failed in its broadside attacks on the legal and factual sufficiency of all Plaintiffs' claims, Sudan shifts to assailing particular Plaintiffs' claims, beginning with family members of embassy-bombing victims. None of these challenges succeeds.

### A.   Section 1605A Creates Jurisdiction For Family-Member Claims.

Sudan first contends (at 47-49) that the district court lacked jurisdiction over family-member Plaintiffs' claims, asserting that §1605A eliminates sovereign immunity only for claims by victims themselves or their legal representatives. Sudan's submission is foreclosed by Circuit precedent and contradicts the statute.

As the district court explained, this Court "squarely held" (JA2720) in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), that the precursor to §1605A—§1605(a)(7)—"clear[ly]" conferred jurisdiction over claims brought by family members of terror victims asserting intentional infliction of emotional distress ("IIED") claims under District of Columbia law. *Id.* at 1030. That holding on "an issue of subject-matter jurisdiction, which the court surely knew it must consider carefully," and which was made with the benefit of "briefing that directly addressed" the issue is controlling here "[b]ecause the language of §1605A(a) is not different from the language of §1605(a)(7)" in any way "relevant" to family-members' claims. JA2720-21. Certainly "nothing suggests

45

the enactment of §1605A(a) was intended to *expand* immunity" and *curtail* relief. JA2721; *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009).

Even if *Cicippio-Puleo* did not control, its reading "is correct as a matter of statutory interpretation." JA2721. Section 1605A(a)(2) eliminates immunity if (*inter alia*) "the claimant or the victim" is a U.S. national, service member, or government employee. 28 U.S.C. §1605A(a)(2). On its face the statute thus permits claims by persons other than the victim.

And nothing in the statute confines non-victim claims to legal representatives. As the Seventh Circuit has held, "[d]enying jurisdiction over family members' claims for American victims would require" the court "to ignore the disjunctive structure of" the statute's words "the claimant *or* the victim." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 569-70 (7th Cir. 2012); *see* JA2719-23. A "claimant" is simply "[s]omeone who asserts a right or demand," Black's Law Dictionary 302 (10th ed. 2014), i.e. anyone who brings a claim. Any doubt is erased by Congress's use of "legal representative" elsewhere in §1605A. Courts presume that Congress's use of different language in neighboring statutory provisions is "'intentiona[l] and purpose[ful],'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted), and Sudan offers no basis to rebut that presumption. *See* JA2722.

Contrary to Sudan's assertion (at 48), this straightforward reading does not "rende[r] the term 'victim' superfluous." Congress referred to both the "victim" and the "claimant" to create jurisdiction so long as *either one* is a U.S. national, servicemember, or government employee. Congress thus ensured that federal courts could hear claims of "claimants" who are U.S. nationals, servicemembers, or federal workers even if their family members directly injured or killed in the bombings were not—and vice versa. That approach, as the district court explained, is perfectly consistent with the "obvious function of [§1605A](a)(2)," which "is to ensure that only claims with a connection to a U.S. national, servicemember, or government employee can be heard." JA2722-23.[10]

## B.    Family-Member Plaintiffs Have Claims Under State Law.

Sudan also argues (at 49-50) that family-member Plaintiffs' claims are foreclosed by 28 U.S.C. § 1606. Sudan asserts (at 50) that §1606, entitled "Extent of Liability," provided the sole "gateway" for claimants to assert state-law claims under §1605(a)(7). And because §1606 does not apply to §1605A, Sudan argues, Congress has "closed the § 1606 gateway" for all state-law claims under §1605A.

---

[10] Sudan also cites a committee report of an "early version" of §1605A's *precursor* (1605(a)(7)), but the report only undermines Sudan's position. It refers to a "victim's legal representative or another person who is a proper claimant" who could bring "an action for wrongful death," H.R. Rep. No. 103-702, at 5 (1994), which assumes someone *besides* the victim's "legal representative" *could* be "a proper claimant."

Sudan forfeited this nonjurisdictional argument when it abandoned the litigation, *see Practical Concepts*, 811 F.2d at 1547, but it is meritless in any event.

Section 1606 provides that "[a]s to any claims for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 …, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," except that foreign states generally may not face punitive damages. As the district court explained, this provision is not, as Sudan claims, a "pass-through" or "gateway" for state-law claims. JA2726. The FSIA's abrogation of sovereign immunity is what allows foreign sovereigns to be sued under state law. If §1606 "were deleted entirely," suits where jurisdiction is premised on §1605 (or §1605A) could still proceed. *Id.*

Instead, as §1606's title reflects, it merely places limits on the "*[e]xtent of liability*" that FSIA defendants can face in the claims to which §1606 applies. For claims where the defendant's immunity is eliminated by a *different* FSIA provision, however—including claims where jurisdiction is created by §1605A—§1606's limits on the extent of liability simply do not apply. That is confirmed by the statutory structure: Section 1605A(c)(4) expressly *authorizes* punitive damages in circumstances where §1606 would *forbid* them. Section 1606 thus poses no bar to the family-member Plaintiffs' claims for which §1605A(a) creates jurisdiction.

48

### C.    Family-Member Plaintiffs Established Valid Intentional Infliction of Emotional Distress Claims Under D.C. Law.

Sudan finally assails the family-member state law claims, arguing (at 50-52) that D.C. law does not permit IIED claims for family members not physically present to witness harm to their relatives.  This nonjurisdictional argument likewise is forfeited and not properly before the Court, and it fails on the merits as well.

Sudan erroneously asserts (at 50-51) that *Pitt v. District of Columbia*, 491 F.3d 494, (D.C. Cir. 2007), requires IIED plaintiffs to be physically present. That is incorrect.  *Pitt* held only that "[t]he District of Columbia has adopted the standard for [IIED] from the Restatement (Second) of Torts."  *Id.* at 507.  That Restatement contains a "caveat" indicating that in certain circumstances, "presence at the time [of the incident] may not be required."  Restatement (Second) of Torts § 46, Caveat (Am. Law Inst. 1965); *id.* § 46, cmt. *l*; JA2727-28.  Courts applying this "caveat" have held that, "'[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present, no essential reason of logic or policy prevents liability."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting Dobbs, *The Law of Torts*, §307, at 834 (2000)).

"Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily."  *Heiser*, 659 F. Supp. 2d at 27.  "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at

the victims but also at the victims' families." *Id.* (citing *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005) (collecting cases)). As the district court explained here, a terrorist attack is "precisely the sort of situation in which presence at the time is not required in light of the severity of the act and obvious range of potential grief and distress that directly results from such a heinous act." JA2728. Sudan does not address the Restatement's caveat or this case law, and its position contradicts every decision of which Plaintiffs are aware addressing the issue in the terrorism context. *See also* 176 A.L.R. Fed. 1 § 18 (collecting cases), 182 A.L.R. Fed. 1 §§ 8(c)-(d) (same).

Sudan instead invokes the Third Restatement, claiming (at 51) requires that family-member Plaintiffs must have been physically present or have "contemporaneously perceived" the attack. Sudan cites *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011), as embracing the Third Restatement, but *Hedgepeth* dealt only with claims of *negligent* infliction of emotional distress, and disclaimed adopting any portions of the Third Restatement not "expressly made a part of this opinion." *Id.* at 800n.15. In any event, the Third Restatement itself acknowledges the Second Restatement's "caveat" and "invitation" to expand liability beyond cases of physical presence in appropriate circumstances, and the long line of decisions holding that family members can maintain IIED claims in terrorism cases. Restatement (Third) of Torts § 46 cmt. *m* (2012). And it adds

that, "[i]f an actor harms someone for the purpose of inflicting mental distress on another person," as is the case with terrorism, "the [presence requirements] *do not apply*." *Id*. (emphasis added).

The district court correctly rejected all of Sudan's attempts to prevent family members of victims of the attacks Sudan sponsored from obtaining redress. To the extent Sudan's challenges to those claims are even cognizable, they are meritless.

## IV.  Sudan's Contention That The *Opati*, Aliganga, And *Khaliq* Plaintiffs' Claims Are Untimely Is Forfeited And Meritless.

Sudan's statute of limitations arguments are not properly before the Court. And they are meritless in any event.

### A.    Sudan Forfeited Its Nonjurisdictional Time-Bar Defense.

Sudan attacks another subset of Plaintiffs—the *Opati*, *Khaliq*, and Aliganga Plaintiffs—contending that their claims are time-barred under 28 U.S.C. §1605A(b). That argument is not properly before the Court: the limitations period is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), which Sudan forfeited by defaulting. Sudan seeks to overcome that elementary rule by asserting the statute of limitations is jurisdictional. Sudan is wrong.

"[F]iling deadlines" are "'quintessential claim-processing rules,' which … do not deprive a court of authority to hear a case" unless "Congress has 'clearly stated' as much." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) (emphases added) (citation omitted). Thus, "to tag a statute of limitations

as jurisdictional," "Congress must do something special, beyond setting an exception-free deadline." *Id.* Absent "'a clear statement'" that it is jurisdictional, "'courts should treat the restriction as nonjurisdictional.'" *Id.* This is true "even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are)." *Id.* Accordingly, the Supreme Court has repeatedly held time bars not jurisdictional where Congress did not clearly state otherwise. *See*, *e.g.*, *Musacchio v. United States*, 136 S. Ct. 709, 717 (2016); *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826 (2013); *Henderson v. Shinseki*, 131 S. Ct. 1197, 1203-06 (2011).

Under the Supreme Court's bright-line test, §1605A(b)'s 10-year limitations period is not jurisdictional because it contains no such clear statement. It does not "expressly refer to subject-matter jurisdiction" at all or otherwise "speak in jurisdictional terms." *Musacchio*, 136 S. Ct. at 717. That is the ballgame.

Sudan resists this straightforward conclusion, but its responses are makeweights. Sudan notes (at 57) that §1605A(*a*) addresses sovereign immunity. But §1605A(*b*) does *not*. Indeed, "Congress's separation of a filing deadline" in one part of the statute "from a jurisdictional grant" in another further "indicates that the time bar is not jurisdictional." *Wong*, 135 S. Ct. at 1633.

Sudan also claims (at 58) that Section 1605A(b) is jurisdictional because, unlike some limitations periods the Supreme Court has held nonjurisdictional,

§1605A(b) refers to "actions" rather than "claims." That word choice, Sudan says, puts §1605A(b) on par with 28 U.S.C. § 2401(a), which this Court described as "jurisdictional," *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987). But *Spannaus* (decided decades before the Supreme Court articulated the bright-line rule) attached no significance to the word "action," and Sudan offers no reason why that semantic distinction makes any difference. *Cf. Wong*, 135 S. Ct. at 1633 n.4 (rejecting similar argument that time bar's reference to not only claims, but also "claimants," rendered it jurisdictional because "none of" the Court's "precedents have either said or suggested that such a difference matters").

Sudan finally resorts to "§1605A(b)'s history," citing (at 57) this Court's passing description in *Simon v. Republic of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), *rev'd sub nom. Republic of Iraq v. Beaty*, 556 U.S. 848 (2009), of the limitations provision that §1605A(b) *replaced*, §1605(f), as appearing in a "jurisdictional provision." *Id.* at 1194. *Simon* merely referred to §1605 as a whole as "the jurisdictional provision upon which plaintiffs rel[ied]," *id.*—the plaintiffs invoked jurisdiction under §1605(a)(7)—but it did not and could not conclude that every part of §1605 implicates jurisdiction. Indeed, §1605(g) addresses stays and "limitations on discovery." In any event, Congress *repealed* §1605(f) and enacted §1605A, which deals separately with jurisdictional and nonjurisdictional issues.

For a time limit to be jurisdictional, Congress must clearly say so.  It not did say so in §1605A(b).

### B.     The Claims Fall Squarely Within The Limitations Period.

Even if Sudan's statute-of-limitations argument were cognizable, it fails because the claims Sudan challenges are timely.

For claims accruing after 1996, §1605A(b) generally requires filing suit within 10 years of the date the cause of action accrued.  But in the same statute that enacted §1605A, Congress created an exception (titled "related actions"), providing that "[i]f an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28," then "*any other action* arising out of the *same act or incident* may be brought under section 1605A" within 60 days of the entry of judgment or the exception's enactment.  National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Pub. L. No. 110–181, §1083(c)(3), 122 Stat. 3, 338-44 (2008).

The *Owens* Plaintiffs timely filed the first of these consolidated cases in 2001 regarding the 1998 attacks.  JA2697.  The three plaintiff groups Sudan challenges as time-barred asserted their claims long before judgment was entered in *Owens* in 2014—the *Khaliq* Plaintiffs in 2010, and the Aliganga and *Opati* Plaintiffs in 2012—and Sudan does not dispute that their claims arise out of the

same acts or incidents as those in *Owens*. JA2694. As the district court correctly concluded, those claims are therefore timely under §1083(c)(3). JA2697-2701.

Sudan insists these three plaintiff groups' claims are nevertheless barred based on an implausibly crabbed reading of §1083(c)(3). According to Sudan (at 52-54), that provision permits only plaintiffs who *themselves* timely filed claims under §1605(a)(7) to bring new actions under §1605A. That contention contradicts the statutory text, which, as this Court has explained, "speaks of 'any other action,'" and "turns on whether the new action 'arises from' the same act or incident, not on whether it is identical to the prior suit or even brought by the same plaintiff." *Roeder v. Islamic Republic of Iran*, 646 F.3d 56, 61 (D.C. Cir. 2011). Courts have repeatedly construed similar "related actions" provisions to allow suits by other plaintiffs. *See*, *e.g.*, *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187-89 (9th Cir. 2001); *Waller v. Burlington N. R.R. Co.*, 650 F. Supp. 988, 990 (N.D. Ill. 1987). Section 1083(c)(3)'s plain language compels the same conclusion. District courts in this Circuit have repeatedly rejected Sudan's reading. *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 16-17 (D.D.C. 2011); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 65, 98 (D.D.C. 2009).

Sudan falls back on Congress's purpose, which cannot trump unambiguous text, *see*, *e.g.*, *Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393,

403 (2010), and only further undermines Sudan's strained reading.  Sudan notes (at

53) that *one* of Congress's goals was to "provide a mechanism for plaintiffs with

§1605(a)(7) actions to bring their actions under the new §1605A(c)," and cites

several cases uncontroversially applying §1083(c)(3) to plaintiffs in that

circumstance.  But it does not remotely follow that this was Congress's *only* aim.

Congress's overarching objective in the 2008 NDAA was to *expand* remedies for

victims of terrorism by making relief *more broadly* available, creating new classes

of plaintiffs, and liberalizing the limitations period to accommodate victims who

might have been dissuaded from suing by earlier judicial rulings.  *See, e.g.*, 154

Cong. Rec. S54-01 (2008).  The opportunity §1605A gave plaintiffs to join

already-pending suits regarding the same terrorist acts is fully consistent with

Congress's broad remedial intent in enacting the terrorism exception and

repeatedly broadening it to overcome obstacles to relief.[11]

---

[11] As the district court explained, there is no substance to Sudan's contention (at 55-56) that §1083(c)(3) does not apply to the *Khaliq* Plaintiffs because the court denied their previous request under §1083(c)(2) to convert their 2004 suit under §1605(a)(7) into one under §1605A.  JA2700.  The 2008 NDAA gave terror victims multiple options—including converting existing cases and filing new, related actions.  Nothing in the statute supports Sudan's theory that plaintiffs barred from pursuing one option could not pursue another.

**V.    The Court Did Not Err In Awarding Punitive Damages.**

Sudan similarly attempts to revive long-ago forfeited attacks on the district court's punitive-damages award, claiming that the court lacked authority to award punitive damages to any plaintiffs or at least to victims' family members suing under state law.    Sudan's punitive-damages arguments are undisputedly nonjurisdictional, and they were never raised at any time before its Rule 60(b) *reply* brief.    *Owens*, D.E.378; *see* JA2731.    In any event, Sudan's punitive damages contentions are baseless.

**A.    Congress Authorized Punitive Damages For Prior Acts.**

Sudan first argues that punitive damages are unavailable for *all* Plaintiffs because the federal statute authorizing them was enacted after the terrorist bombings made possible by Sudan's material support of al-Qaeda.    That is incorrect.

Sudan does not dispute Congress's power to authorize punitive damages for prior conduct.    And for good reason:  The Constitution places certain particular limits on retroactive legislation—the *Ex Post Facto*, Takings, and Due-Process Clauses, U.S. Const. art. I, §9, cl.3, amend. V—but those "restrictions … are of limited scope."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 267 (1994).    As Sudan's own authority explains, "[a]bsent a violation of one of those specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient

57

reason for a court to fail to give a statute its intended scope." *Id.* Despite vague allusions to "constitutional concerns," Sudan does not allege (let alone establish) that Congress exceeded its power. There are no "constitutional concerns" to avoid.

Sudan instead contends (at 59-61) that Congress did not provide a sufficiently "clear statement" to rebut the ordinary "presumption" of nonretroactivity. Sudan's argument falters at the outset because the presumption it invokes has little if any application to the FSIA. "The aim of the presumption [against retroactivity] is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). "[T]he principal purpose of foreign sovereign immunity," however, "has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts." *Id.* "In this *sui generis* context," it is thus "more appropriate, absent contraindications, to defer to the most recent decision" of the "political branches" responding to "current political realities and relationships"—"namely, the FSIA"—rather "than to presume that decision *inapplicable* merely because it postdates the conduct in question." *Id.* Retroactivity, is no stranger to the original FSIA enacted in 1976, *see id.* at 697-700 (holding FSIA applicable to acts taken in 1948), and there is no reason to assume that Congress, in amending it in the decades since—particularly in

58

responding to evolving and expanding foreign-state sponsorship of terrorism—treaded more lightly in effort to preserve settled expectations.

In any event, Congress's intent to permit punitive damages for past acts of extrajudicial killing is unmistakable. Section 1605A(c) expressly authorizes "punitive damages." Section 1083(c)(2) of the 2008 NDAA, in turn, states that already-pending §1605(a)(7) actions "shall … be given effect as if the action had originally been filed under section 1605A(c)." And §1083(c)(3) provides that "any other action arising out of the same act or incident" as a timely 1605(a)(7) action "may be brought under section 1605A." *See also Bakhtiar v. Islamic Republic of Iran*, 668 F.3d 773, 774 (D.C. Cir. 2012) (discussing the 2008 NDAA's authorization of punitive damages for pending cases). Congress thus explicitly permitted punitive damages for already-pending cases, which necessarily concern conduct *before* the statute's enactment.

That authorization for punitive damages in pending cases was no accident. Congress plainly intended that the 2008 NDAA's amendments would "apply to any claim filed or refiled under the new section 1605A." H.R. Rep. 110-477, at 1001 (2007) (Conf. Rep.). And it specifically contemplated that even plaintiffs who had obtained *final* judgments under §1605(a)(7) could bring new suits under §1605A's "related action" provision. *See* 154 Cong. Rec. S54-01 (2008) (Statement of Sen. Lautenberg). "The only reasonable explanation for allowing

59

such actions … is to ensure that plaintiffs who had obtained compensatory relief against terrorist-defendants could return to seek punitive damages." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 178-79 (D.D.C. 2010) (terror-victim plaintiffs could seek punitive damages for prior conduct under the 2008 NDAA).

Even if the nonretroactivity presumption Sudan invokes were applicable, the text and purpose of the 2008 NDAA plainly rebut it.

### B.    Punitive Damages Are Available Under State Law.

Sudan briefly challenges (at 61-62) the award of punitive damages to foreign-national family members suing under state law, but does not dispute that *if* such plaintiffs have valid causes of action under D.C. law (as they do, *supra* pp. 50-54), the district court could award punitive damages upon finding that the tort "committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Howard University v. Wilkins*, 22 A.3d 774, 783 (D.C. 2011).  Nor does Sudan challenge the district court's finding that its "horrific" acts met that standard. *See* JA2383.

Instead, Sudan asserts that the punitive-damages bar in §1606 forbids the award of punitive damages against a foreign state.  But as the district court concluded—and "Sudan itself highlight[ed]" below and on appeal (at 50)—"§1606 does not apply to claims brought under §1605A."  JA2733.  "Sudan does not get to selectively apply §1606 to §1605A when it helps but not when it hurts." *Id.*

## VI.    The District Court Did Not Abuse Its Discretion By Declining To Vacate The Judgments Based On Sudan's Inexcusable Neglect.

In a final, grasping effort to evade responsibility for the terror it sponsored, Sudan finally urges overturning the judgments based on its own decision to abandon the case for years.  After its initial default, Sudan appeared in the case and actively litigated for several years, including an appeal to this Court.  JA2667-68. But Sudan then walked away from the case, while the victims undertook the heavy burden of proving their entitlement to relief.  Five years later, long after judgments had been entered against it, Sudan finally reappeared, seeking vacatur under Rule 60(b)(1), claiming its default should be written off as "excusable neglect."[12]

The district court sensibly rejected Sudan's request.  JA2673-82.  To upset that decision on appeal, Sudan must show the court abused its discretion in declining to vacate its own judgments—a decision that amounts to "discretion piled on discretion."  *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990).  Sudan does not come close.

The district court, which has overseen the litigation for well over a decade, weighed all the factors and found that "Sudan's years of total nonparticipation in

---

[12] Sudan also invoked Rule 60(b)(6), but as the district court explained, its Rule 60(b)(6) argument was merely a "rehash" of its Rule 60(b)(1) argument—and thus untimely as to *Mwila* and *Khaliq*, and meritless as to all Plaintiffs for the same reasons as Sudan's Rule 60(b)(1) argument.  JA2680-82; *see also Salazar ex rel. Salazar v. D.C.*, 633 F.3d 1110, 1121-22 (D.C. Cir. 2011).

this litigation, despite full awareness of its existence, cannot be justified as 'excusable neglect.'"  JA2664, 2674-75 (citing *FG Hemisphere*, 447 F.3d at 838). Sudan cited its domestic turmoil, but as the court explained, that was of its "own making"—and in any event could not excuse Sudan's complete, years-long silence after initially participating.  JA2676.  The court found "quite literally, incredible" Sudan's claim that its "officials could not find the opportunity  over a period of *years* to send so much as a single letter or email communicating Sudan's desire but inability to participate in these cases."  JA2676-77.  Nor could Sudan plausibly claim ignorance of the law given its hiring of "sophisticated U.S. legal counsel" in 2004.  JA2674.

The court was thus "by no means persuaded" that Sudan "behaved in good faith."  JA2678.  And "vacatur would pose a real risk of prejudice to the plaintiffs"—rendering massive time and money spent litigating the merits a waste, and creating grave risks that evidence might be lost and that more plaintiffs "might die during the years it would take to relitigate these cases."  JA2679-80

None of the cases Sudan cites allowed vacatur in the face of such rank neglect, let alone held denial of relief in analogous circumstances an abuse of discretion.  In *Bridoux v. Eastern Air Lines*, 214 F.2d 207 (D.C. Cir. 1954), the defendant had no notice of the default, it responded promptly upon obtaining notice, and vacatur posed no prejudice to the plaintiff.  In *FG Hemisphere*, the

62

motion to execute was "the first time [Congo] received the slightest hint that its diplomatic properties were in jeopardy," the motion's use of "English rather than French virtually guaranteed [Congo's] inability to file a timely response," and Congo's four-week delay in securing counsel was minimal and excusable, causing no prejudice.  447 F.3d at 839-840.

*Ungar v. Palestine Liberation Org*., 599 F.3d 79 (1st Cir. 2010), likewise lends Sudan no support.  *Ungar* merely rejected a "categorical bar to relief" under Rule 60(b)(6), as "extraordinary circumstances" may "in *rare* instances" create the "possibility" of relief even after a willful default.  *Id.* at 83-84, 87.  Even assuming arguendo that *Ungar* is correct, *but cf. Salazar*, 633 F.3d at 1121-22 (D.C. Cir. 2011) ("a lack of diligence" *does* "preclude a finding of extraordinary circumstances"), it has no bearing because the district court here expressly *disclaimed* reliance on the "categorical rule disapproved in *Ungar*."  JA2681. Instead, it rejected Sudan's Rule 60(b)(6) argument as duplicative of its meritless Rule 60(b)(1) claims, and to the extent Sudan raised new issues, "simply unconvincing and unsupported."  JA2681-82.  And even if exceedingly rare extraordinary circumstances may sometimes warrant excusing a willful default, Sudan's deliberate, years-long abandonment of *this* case hardly merits a mulligan.

Sudan did not defend these cases, in short, "as a result of either deliberate choice or inexcusable recklessness." JA2664. "Either way," the district court held, "Sudan has no one to blame for the consequences but itself." *Id.*

## CONCLUSION

The judgments should be affirmed.

Dated:  August 19, 2016                    Respectfully submitted,

  /s/ Stuart H. Newberger

| | |
|---|---|
| Steven R. Perles | Stuart H. Newberger |
| Edward B. MacAllister | Clifton S. Elgarten |
| PERLES LAW FIRM, PC | Aryeh S. Portnoy |
| 1050 Connecticut Avenue, N.W. | Emily Alban |
| Suite 500 | John L. Murino |
| Washington, D.C.  20036 | CROWELL & MORING LLP |
| (202) 955-9055 | 1001 Pennsylvania Avenue, N.W. |
| sperles@perleslaw.com | Washington, D.C.  20004 |
| emacallister@perleslaw.com | (202) 624-2500 |
| | snewberger@crowell.com |
| Thomas Fortune Fay | |
| FAY LAW GROUP, P.A. | John Vail, Esquire |
| 777 6th Street, N.W., Suite 410 | JOHN VAIL LAW PLLC |
| Washington, D.C.  20001 | 777 6th Street, N.W., Suite 410 |
| (202) 589-1300 | Washington, D.C.  20007 |
| ThomasFay@aol.com | (202) 589-1300 |
| | john@johnvaillaw.com |
| Jane Carol Norman | |
| BOND & NORMAN LAW, P.C. | Matthew D. McGill |
| 777 6th Street, N.W., Suite 410 | Jonathan C. Bond |
| Washington, D.C.  20001 | Michael R. Huston |
| (202) 682-4100 | GIBSON, DUNN & CRUTCHER LLP |
| janenorman@bondandnorman.com | 1050 Connecticut Avenue, NW |
| | Washington, D.C.  20036 |
| | (202) 887-3680 |
| | MMcGill@gibsondunn.com |

64

Michael J. Miller
David J. Dickson
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA  22960
(540) 672-4224
mmiller@millerfirmllc.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,947 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

DATED this 19th day of August, 2016.


 */s/  Stuart H. Newberger*
Stuart H. Newberger

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Christopher Mark Curran
White & Case LLP
701 13th Street, NW
Washington, DC 20005
ccurran@whitecase.com

Claire Angela DeLelle
White & Case LLP
701 13th Street, NW
Washington, DC 20005
claire.delelle@whitecase.com

Nicole Erb
White & Case LLP
701 13th Street, NW
Washington, DC 20005
nerb@whitecase.com

Asim A. Ghafoor
Law Office of Asim Ghafoor
1101 30th Street, NW
Suite 500
Washington, DC 20007
asim@glawoffice.com

Bruce Elliot Fein
Bruce Fein & Associates, Inc.
722 12th Street, NW
5th Floor
Washington, DC 20005
bruce@thelichfieldgroup.com

 */s/  Stuart H. Newberger*
Stuart H. Newberger